## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ELAINE L. CHAO, Secretary )
of Labor, United States Department )
of Labor, )  **CIVIL ACTION NO. 04-11310 NG**
  Plaintiff )
 )
v. )
 )
LE INC, LE & PHAM INC., )
LE CAFE INC., LE & T INC., )
PHO PASTEUR INC., and )
DUYEN LE, )
  Defendants )
 )

## THE DEFENDANTS' MOTION TO DISMISS OR, IN THE
## ALTERNATIVE, FOR A MORE DEFINITE STATEMENT

### Hearing Requested

The defendants, Duyen Le, et al., pursuant to Fed. R. Civ. P. 12(b)(1), move to

dismiss the complaint which was brought by the United States Department of Labor because

of a lack of subject-matter jurisdiction. In the alternative, the defendants move for a more

definite statement under Fed. R. Civ. P.12(e).

### Introduction

The plaintiff, U.S. Department of Labor, has filed a civil complaint against the

defendant, Duyen Le and his restaurants. The complaint consists of four pages of vague,

conclusory statements which allege that, in some unspecified ways, the defendants, Duyen

Le, and the five restaurants which he has operated in the Greater Boston area constitute an

"enterprise engaged in commerce or in the production of goods for commerce;" that the

defendants have "willfully and repeatedly violated and are violating the provisions of sections

7 and 15(a)(2) of the Act by employing employees for workweeks longer than forty (40)

2

hours without compensating them for their employment in excess of forty (40) hours in said workweeks, at rates not less than one and one-half times the regular rate at which they were employed;" that these acts have occurred since "December 4, 2000." The plaintiff seeks injunctive relief for, among other alleged violations, a purported violation of § 6 of the Act, which section relates to the payment of minimum wages.

The plaintiff's complaint avers that Duyen Le resides in Weston, Massachusetts and that he operates five restaurants which are located in the Boston area. The complaint further alleges that the defendants have failed to pay overtime to the certain restaurant employees who are identified in Exhibits A-E, as required under § 7 of the Fair Labor Standards Act, 29 U.S.C. § 207. All of the employees are alleged to have worked locally in one of the five restaurants Duyen Le owns or operates in the Boston area.

The plaintiff also alleges, without any specificity whatsoever, that, in some undescribed manner, the defendants "employed employees in the activities of said enterprise engaged in commerce or in the production of goods for commerce, including employees handling, selling or working on goods or materials that have been moved in or produced for commerce." In addition, the plaintiff has also failed to identify which goods "that have been moved in or produced for commerce" have been handled, sold or worked on by employees.

3

# ARGUMENT

**1. This Court Lacks Subject-Matter Jurisdiction Over The Alleged Violations Because The Defendants Are Not Engaged In Interstate Commerce Or In The Production Of Goods For Interstate Commerce.**

It is long settled that a federal court must presume the absence of jurisdiction and may not proceed until it determines that the matter is within its rightful jurisdiction.[1] In this case, the United States Department of Labor has invoked the jurisdiction of this Court under 29 U.S.C. § 217 and 28 U.S.C. § 1345. However, the plaintiff has failed to provide the Court or the defendants with any factual specificity which would show, upon what basis, that the court may exercise jurisdiction over an employment matter which appears to be wholly local and which would be therefore governed under Massachusetts Minimum Wage and Overtime statute, M.G.L. c. 151.

**a. The Plaintiff Has Failed To Allege Or To Show With Any Factual Specificity That The Defendants Are Engaged In Interstate Commerce Or In The Production Of Goods For Interstate Commerce.**

In enacting the Fair Labor Standards Act during the New Deal, the United States Congress declared:[2]

> (a) The Congress hereby finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the

---

[1]     *Minnesota v. Hitchcock*, 185 U.S. 373, 372, 22 S.Ct., 650, 654, 46 L. Ed. 954(1902); see also *Insurance Co of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982).

[2]     § 202.  Congressional findings and declaration of policy.

4

free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce. That Congress further finds that the employment of persons in domestic service in households affects commerce.[3]

The commerce referred to in Fair Labor Standards Act specifically means interstate commerce.[4]  It is also settled that Congress did not intend to give the same  scope to the term "engaged in commerce" in Fair Labor Standards Act as it did to term "affect commerce" in National Labor Relations Act (29 U.S.C. § §  151 *et seq*.).[5]

The last significant U.S. Supreme Court case to significantly construe the "engaged in commerce or in the production of goods provision" of FLSA was a decision by the Warren Court which struck down a FLSA enforcement action for alleged overtime  violations.[6]  In that decision, the Court painstakingly explored the contours of the scope of FLSA. The Court found that employees of a large construction contractor, which was engaged in constructing a dam solely to increase the reservoir capacity of the local water system of a city and its vicinity, all within a single State, were found not "engaged in commerce or in the production

[3]    The specific definitions included in the original act, and in subsequent 1961 amendments to the Act are consistent with the requirements that the employees or covered enterprises be engaged in interstate commerce or in the production of goods for interstate commerce:
> "§  203.  Definitions
> "As used in this Act--
> "....
> " (b) Commerce means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof...."

[4]    *Fleming v. Alterman*, 38 F. Supp. 94 (Dist. Ga., 1941), *Divine v. Levy*,  39 F. Supp. 44 ( Dist. La., 1941) ; *Jones v. Springfield Missouri Packing Co.*, 45 F Supp. 997 (Dist. Mo, 1942,); *Daly v. Citrin*,  53 F. Supp. 876 (Dist. Mich, 1943).

[5]    *Keen v. Mid-Continent Petroleum Corp.*, 63 F. Supp. 120 ( N. Dist. Iowa, 1945), affd 157 F. 2d 310 (8th Cir., 1946).

[6]    *Mitchell v. H.B. Zachary Co.*, 362 U.S. 310 (1960).

5

of goods for commerce" or in "any closely related process or occupation directly essential to the production thereof," within the meaning of §§ 3 (j) and 7 (a) of the Fair Labor Standards Act, and that, as such, were, not covered by the overtime requirements of the Act, notwithstanding the fact that a substantial part of the water would be used by producers of goods for interstate commerce and an insignificant part by interstate instrumentalities.

In *Mitchell*, the Supreme Court specifically found that:

By confining the Act to employment "in commerce or in the production of goods for commerce," Congress has impliedly left to the States a domain for regulation.  For want of a provision for an administrative determination, by an agency like the National Labor Relations Board, the primary responsibility has been vested in courts to apply, and so to give content to, the guiding yet undefined and imprecise phrases by which Congress has designated the boundaries of that domain.[7]

And:

...[T]he Act also manifests the competing concern of Congress to avoid undue displacement of state regulation of activities of a dominantly local character.  Accommodation of these interests was sought by the device of confinement of coverage to employment in activities of traditionally national concern.  The focus of coverage became "commerce," not in the broadest constitutional sense, but in the limited sense of § 3 (b) of the statute: "trade, commerce, transportation, transmission, or communication among the several States . . . ." Employment "in" such activities is least affected by local interests.  A step removed from employment "in commerce" is employment "in" production which is "for" commerce. Under this clause we have sustained coverage whether the product is to be consumed primarily by commerce in the statutory sense, by its "facilities and instrumentalities," see *Alstate Construction Co.* v. *Durkin, 345 U.S. 13,* or, as in the case of the products of the industrial consumers of water here, to move in it.  Furthest removed from "commerce" is employment not "in" production "for" commerce but in an activity which is only "related" to such production.  In applying this provision, we have necessarily borne in mind that it is furthest removed in the scheme of the statute from the hub of the national interest in "commerce" upon which a limited displacement of state power is predicated.[8]

---

[7]    *Mitchell*, at 314. A copy of that decision is attached to this motion.

[8]    *Mitchell*, at 316.

6

In the case, at bar, the fact that the defendants own or operate five restaurants in the Boston area, which presumably cater to local residents, employee local employees, and serve fresh, perishable food purchased locally, suggests that the plaintiff's complaint is fatally defective. As discussed above, it is settled law that Congress never intended to stretch the concept of what constitutes "interstate commerce" so broadly that it the reach of FLSA would be without limits.[9]

**b.**  **The United States Department of Labor has neither alleged nor pled with any factual specificity which would show that the enterprise in question, was, in fact, engaged in interstate commerce.**

The defendants have been named as parties to the instant action by virtue of 1961 amendments to FLSA. The effect of 1961 amendments to the Fair Labor Standards Act, which amendments adopted the "enterprise concept,"[10] was to expand minimum wage and

---

[9]     Congress, by excluding from coverage of Fair Labor Standards Act employees whose activities merely "affect commerce," indicated its intent not to make scope of Act coextensive with its power to regulate commerce. *Mitchell v. Lublin, McGaughy & Associates*, 358 U.S. 207, 3 L. Ed 2d 243, 79 S. Ct. 260 (1959).

Fair Labor Standards Act is not coextensive with limit of power of Congress over commerce. *Walling v. American Stores Co.,* 133 F.2d 840 (3rd Cir., 1943); *Billeaudeau v. Temple Associates, Inc.*, 213 F.2d 707(5th Cir., 1954), cert den,  348 U.S. 959, 99 L Ed. 749, 75 S. Ct 451 (1955).

Congress did not intend to extend federal control throughout the farthest reaches of the channels of interstate commerce when it enacted Fair Labor Standards Act.  *Lofther v. First Nat. Bank*, 138 F.2d 299 (7th Cir., 1943).

Congress did not intend to exercise the full scope of its commerce power when it enacted Fair Labor Standards Act but plainly indicated its purpose to leave employment essentially local in character to state control.  *Rucker v. First Nat. Bank*, 138 F.2d 699 (10th Cir., 1943), cert. den.  321 U.S. 769, 88 L.Ed 1065, 64 S.Ct. 524 (1944); *Wirtz v. R. E. Lee Electric Co.*, 339 F.2d 686 (4th Cir., 1964).

FLSA does not extend to any business or other transactions which merely affect commerce. *Noonan v. Fruco Constr. Co.*, 140 F.2d 633 (8th Cir., 1943).

[10]     29 U. S.C. § 203:

(continued...)

7

maximum hours coverage of certain employees, and to extend protection to fellow employees of any employee who would have been protected by original Act, but the amendments did not enlarge class of employers subject to Act.[11]

Even after the 1961 amendments to 29 USCS § 203, the U.S. Department of Labor is still required to show that the covered enterprise, as here alleged, is engaged in interstate commerce or in the production of goods for interstate commerce;  which the Department of Labor has here failed to do with any meaningful factual specificity.[12]

In the instant matter, the U.S. Department of Labor, has merely filed a notice pleading but it has not provided any flesh, bones or blood to its allegations:  There are no facts pled which would show that the Court, by virtue of what specific defendants' actions, it has subject-matter jurisdiction. Federal courts have long held that the test to determine whether an employee or an enterprise is engaged in commerce is not whether their activities affect or

---

[10](...continued)
    "....
    "  (s) (1) Enterprise engaged in commerce or in the production of goods for commerce means an enterprise that--
        "  (A) (i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $ 500,000 (exclusive of excise taxes at the retail level that are separately stated)...."

[11]    *Maryland v. Wirtz*,  392 U.S. 183, 20 L. Ed 2d 1020, 88 S. Ct. 2017 (1968),  hold. ovrld by *National League of Cities v. Usery*, 426 U.S. 833, 49 L. Ed 2d 245, 96 S. Ct. 2465(1976).

[12]    *Childress v Earl Whitley Enterprises, Inc.*, 388 F.2d 742 (4th Cir., 1968).

8

indirectly relate to interstate commerce, but whether they are actually in or so closely related to the movement of the commerce as to be a part of it.[13]

**c.    The test to determine subject-matter jurisdiction with respect to whether the defendants are an enterprise engaged in interstate commerce or in the production of goods for interstate commerce is fact-specific, but no such specific facts have been pled by plaintiff.**

The plaintiff's failure to plead with any facts concerning the defendants' actions which would show that they are subject to the jurisdiction of this Court compromises the ability of the defendants to properly test jurisdictional issues, and impedes this Court's ability to determine whether it may properly exercise jurisdiction over the claims asserted.

When confronted with issues of subject-matter jurisdiction which involve FLSA claims, federal courts must be guided by practical considerations to determine what constitutes "commerce" or "engaged in commerce."[14]  Thus, for example, it has been held that the test to determine whether an employee or employer is engaged in commerce within the meaning of the Fair Labor Standards Act is whether the work is so directly and vitally related to functioning of instrumentality or facility of interstate commerce as to be, in practical effect, part of it, rather than isolated, local activity.[15]

The phrase "engaged in commerce" when used to measure coverage under Fair Labor Standards Act encompasses only employment actually in the movement of commerce or activities so closely related thereto as to be practically a part of it; in other words, engaged in

---

[13]    *McLeod v. Threlkeld*,  319 U.S. 491, 87 L. Ed 1538, 63 S. Ct 1248 (1943).

[14]    *Overstreet v, North Shore Corp.*,  318 U.S. 125, 87 L. Ed 656, 63 S. Ct 494 (1943).

[15]    *Mitchell v C. W. Vollmer & Co.*, 349 U.S. 427, 99 L.Ed 1196, 75 S.Ct 860 (1955).

the interstate transportation or movement of commerce.[16]    Where, for example, the

employees' activities involved work related to facilities, such as bridges, canals, and roads, the

question of whether they are engaged in commerce within the meaning of Fair Labor

Standards Act is determined by practical test - viz.,  whether the work is so directly and

vitally related to functioning of an instrumentality or facility of interstate commerce as to be,

in practical effect, a part of it, rather than an isolated, local activity.[17]  "Engaged in

commerce" and "in production of goods for commerce" are not synonymous but

supplementary to each other; those phrases having been deliberately chosen as appropriate

language to delineate entirely different fields of coverage under Fair Labor Standards Act.[18]

The Supreme Court has held that, by its legislative history,  the Federal Fair Labor

Standards Act of 1938, 29 USCS § §  201 et seq., is not coextensive with the limits of the

power of Congress over commerce. By reason of the underlying assumptions of our country's

---

[16]    *Rucker v. First Nat. Bank*, 138 F.2d 699  (10th Cir., 1943), cert den  321 U.S. 769, 88
L. Ed 1065, 64 S. Ct 524 (1944).
    To be "engaged in commerce" an employee must be actually employed in the
movement of commerce or in work so closely related thereto as to be for all practical
purposes a part of it.  *Clyde v. Broderick*, 144 F.2d 348 (10th Cir., 1944); *Duke v. Birchfield*,
222 F Supp 258 (ED. OK, 1963).
    Practical test to be applied in determining whether employee is engaged in commerce
is whether, without particular service, interstate commerce would be impeded or abated.
*Republic Pictures Corp. v. Kappler*, 151 F.2d 543  (8th Cir., 1945), affd  327 U.S. 757, 90 L.
Ed 991, 66 S. Ct 523 (1946), reh. den.,  327 U.S. 817, 90 L. Ed 1040, 66 S. Ct. 804 (1946).
    It is the physical immediacy of connection with actual transportation movement that
determines whether an employee's activities cause him to be engaged in commerce.  *Laudadio
v. White Const. Co.*, 163 F.2d 383 (2nd Cir., 1947).

[17]    *Mitchell v Lublin, McGaughy & Associates*, 358 U.S. 207, 3 L. Ed 2d 243, 79 S. Ct.
260 (1959).

[18]    *Rucker v. First Nat. Bank*,  138 F.2d 699 (10th Cir., 1943), cert den  321 U.S. 769, 88
L. Ed 1065, 64 S. Ct 524 (1944).

10

dual form of government, and the consequent presupposition that the legislative draftsmen

properly expressed America's history and habits, the Court has held  that it cannot be assumed

that, when Congress adopted the Fair Labor Standards Act of 1938, it thereby intended to

address all situations which fell within the general mischief that gave rise to that legislation.[19]


2.      **The Plaintiff Cannot Show, Either As A Matter of Fact Or Law, That Any
        Statutory Exemption For Overtime Payments To Which The Defendants Are
        Entitled Under Massachusetts Law Have Been Preempted By Federal Law.**

The United States Congress and Massachusetts General Court have enacted legislation

which regulates the hours and wages of covered employees. Both the Massachusetts statute

and the federal law require minimum wages and overtime to be paid to all covered

employees. The federal Fair Labor Standards Act (FLSA)[20] covers employees "engaged in

[interstate] commerce or in the production of goods for [interstate] commerce."[21]

Massachusetts law covers all employees in Massachusetts.[22]

Under Massachusetts and federal law, employers are required to pay an employee at

the rate of time and one-half the regular hourly rate for overtime work unless the employee is

"exempt" or falls within one of the statutory exclusions. M.G.L. chapter 151, § 1A of the

---

[19]     *A. B. Kirschbaum Co. v. Walling*,  316 U.S. 517, 86 L. Ed 1638, 62 S. Ct 1116
(1942).

[20]     § 29 U.S.C.A. § §  201-219, 251-262.

[21]     29 U.S.C.A.§ §  202-203.

[22]      See M.G.L. c. 151.  Effective November 5, 1998, the potential civil and criminal
penalties for violation of the minimum wage and overtime laws were increased significantly.

11

contains the following exclusion from overtime pay with respect to one category of

employees:

> **"Overtime pay; excluded employments.**
> "    This section shall not be applicable to any employee who is employed: -
> **"...**
> "(14)   in a restaurant...."

FLSA, by contrast, contains no such exclusion; and many of the exclusions or

exemptions it does provide are very different from those which the Massachusetts legislature

has chosen to provided under the Massachusetts statute.  § 218 of FLSA does provide that if

either federal or state law provides a greater degree of protection for employees, that law will

apply. However, it is important to emphasize that the language of § 218 specifically address

issues of "minimum age," "maximum workweek." "employment of child labor, " but it is

silent with respect to payment of overtime or exclusions from overtime payments.[23]

---

[23]    The Massachusetts Supreme Judicial Court has opined, in dicta, that  "Title *29 U.S.C. § 218*(a) makes clear that the wage and hour standards set forth in the FLSA are the floor, and that 'FLSA does not preempt any existing state law that establishes a higher minimum wage or a shorter workweek than the federal statute.' *Cosme Nieves* **[\*171]** *v. Deshler, 786 F.2d 445, 452* (1st Cir.), cert. denied, 479 U.S. 824, 93 L. Ed. 2d 47, 107 S. Ct. 96 (1986). Conversely, a State law may be preempted by the FLSA if it conflicts with the FLSA, or if it is impossible for a third party to comply with both the FLSA and the State law. See *Commonwealth Elec. Co. v. Department of Pub. Utils.*, 397 Mass. 361, 375-376, 491 N.E.2d 1035 (1986), cert. denied, 481 U.S. 1036, 107 S. Ct. 1971, 95 L. Ed. 2d 812 (1987)." *Goodrow v. Lane Bryant*, 432 Mass. 165 (2000), at 175.

12

There is no presumption in favor of preemption.[24] Moreover, whether a wage or overtime claim is preempted depends, in part, upon whether the state law statute, viewed in its entirety, provides equal or a greater protection to employee.[25]

M.G.L. c. 151 was enacted a comprehensive, humanitarian, remedial statute that was most recently amended by the General Court on November 16, 2003. Section 3 of the Act empowers the Attorney General of the Commonwealth to enforce the provisions of the act, § 19 provides for criminal penalties for employers who willfully violate the act, and § 20 of the act grants, in addition the right of the attorney general to prosecute civil claims, a private right of action to aggrieved employees who may recover triple damages and attorney's fees.

More importantly, the current Massachusetts minimum wage is $6.75 per hour while the federal minimum wage remains frozen at $5.15 per hour.[26] Both Massachusetts and federal law require payment of overtime wages at rate of time and one-half the employee's

---

[24]    See *Massachusetts v. Morash,* 490 U.S. 107 (1989), where the Supreme Judicial Court found that the Massachusetts Payment of Wages Statute, M.G.L. c. 149, §148 with respect to payment for accrued vacation was preempted by ERISA, 29 U.S.C. 1144(a). That decision was reversed by the U.S. Supreme Court.

Any argument by plaintiff that the Massachusetts exclusion of overtime for a narrow category of employees - i.e. those who work in restaurants - is preempted by FLSA's overtime provisions is at loggerheads with current Supreme Court jurisprudence. Witness the decision written by Justice Rehnquist in U.S. v. Lopez, 115 S.Ct. 1624, 131 L.Ed 2626 (1995). In that decision, by a 5-4 vote, the U.S. Supreme Court struck down a San Antonio gun conviction which occurred within a 100 yards of a school on the grounds that the interstate commerce clause did not apply. Given the U.S. Supreme Court's current preoccupation with the doctrine of "original intent" and the current composition of the federal judiciary, it is more likely that today's federal courts, under the "reserved powers" clause of the Tenth Amendment, would defer to the laws of the "sovereign states" themselves to enforce their own comprehensive, remedial statutes.

[25]    *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985).

[26]    M.G.L. c. 151, § 1; 29 U.S.C. § 206(a).

13

regular hourly rate to non-exempt employees for hours worked in excess of forty hours in one workweek.[27]

The plaintiff has not alleged, and it would be unable to show, that the Massachusetts minimum wage and overtime statue which provides for a higher minimum wage, and therefore higher overtime payments to covered employees, is not a carefully thought-out, balanced statute designed to better compensate employees who work within the Commonwealth, than those millions of employees throughout the United States who are covered only by FLSA's significantly lower minimum wage. Further, the Department of Labor is unable to show that any of the twenty categories of employees who are excluded from overtime payments under M.G.L. c. 151, § 1A, which includes the category of restaurant employees here at issue, is not a product of careful legislative deliberations and that the exclusions reflect a balanced, and fair, public policy which is designed to promote full employment coupled with adequate compensation.[28]

The intent of the Massachusetts General Court in enacting M.G.L. c. 151 to provide coverage to all employees must be juxtaposed to the U.S. Department of Labor's claim of implied conflict preemption. The United States Supreme Court has unequivocally held that Congress, in enacting the Fair Labor Standards Act, made it clear that it intended to leave local business to the protection of the states and did not see fit to exhaust its constitutional

---

[27]    29 U.S.C.. § 207; M.G.L. c. 151, § 1A.

[28]    By contrast § § 207 and 213 of 29 U.S.C. 201-*et seq*. contain a virtual cornucopia of exceptions and exclusions from overtime which, when compared to the Massachusetts statute, make the latter appear to be more employee-friendly and egalitarian.

14

power over commerce.[29]   Congress did not intend to exert its full power over commerce in

Fair Labor Standards Act, but intended to leave purely local concerns to state control.[30]

     **3.**       **The Defendants' Need, And Are Entitled, To A More Definite Statement**

In the alternative,  the defendants, Le, Inc. et al.  and Duyen Le request that, under

Fed. R. Civ. P. 12(e), the plaintiff be directed to make a more definite statement in order that

they may be able to properly frame their response to this Complaint, and to prepare to defend

against the Department of Labor's enforcement action. The plaintiff's complaint is so "vague"

and so "ambiguous" that the defendants "cannot reasonably be required to frame a responsive

pleading."

**Deficiencies in the Complaint**

The plaintiff's vagueness and ambiguity infects critical sections of the Department of

Labor's Complaint:

**How**

The plaintiff alleges, in ¶ X of its Complaint, that "...the defendants employed

employees in the activities of said enterprise in commerce or in the production of goods for

commerce, including employees handling, selling or otherwise working on goods or materials

that have been moved in or produced for commerce..."

The defendants, in order to answer that allegation factually, need to know whether the

plaintiff alleges that the defendants are, in fact, engaged in interstate commerce, or have

---

[29]     *Maneja v. Waialua Agricultural Co.,*  349 U.S. 254, 99 L. Ed 1040, 75 S. Ct 719 (1955).

[30]     *Wiley v. Stewart Sand & Material Co.*,  240 Mo. App. 392, 206 SW2d 362 (1947).

produced goods for interstate commerce.  In addition, since the predicates required to  show that an employer is "engaged in [interstate] commerce" or "in the production of goods for [interstate] commerce," are extremely fact specific, as discussed above, the defendants need to know precisely in what ways and through which precise activities the plaintiff alleges that the defendants are engaged in interstate commerce or in the production of goods for interstate commerce.

### When

The second species of vagueness and ambiguity relates during what time periods the plaintiff claims that the restaurant employees identified in Exhibits A-E have not been paid overtime.  Paragraph X  of the Complaint merely alleges:

> "Defendants have willfully and repeatedly violated and are violating the  provisions of sections 7 and 15(a)(2) of the Act by employing employees for workweeks longer than forty (40) hours without compensating them for their employment in excess of forty (40) hours in said workweeks, at rates no less than one and one-half time the regular rate at which they were employed."

Because the allegation is so broad and conclusory, the defendants are unable to admit or deny paragraph X, since that paragraph does not provide any indication of what periods of time they relate to, and the allegation is stated in a deliberately vague and ambiguous manner: It merely alleges that the defendants have failed and continue to fail to pay overtime to all employees identified in Exhibits A-E to the Department of Labor's Complaint, at various unidentified times. Since this allegation also implicates statute of limitations issues, as suggested under the Portal-To-Portal Act[31] for wilful and non-willful violations, the defendants are legally entitled to this information.

---

[31]      29 U.S.C. § 255.

16

**What**

Equally vague and ambiguous is the nature of plaintiff's allegation that the defendants have violated § 6 of FLSA, in addition to other sections of the Act. Does the plaintiff allege that the defendants have failed to pay minimum wages to the employees identified in Exhibits A-E to the Complaint?

**Conclusion**

WHEREFORE, the plaintiff's complaint must be dismissed because of this Court lacks subject-matter jurisdiction. In the alternative, the defendants request that, to enable them to frame their response to the Complaint, the plaintiff be required to file and serve a more definite statement, making clear:

1.    Whether, the plaintiff alleges that the defendants are, in fact, engaged in interstate commerce, or have produced goods for interstate commerce?

2.    If yes, in precisely in what ways and through which precise activities the plaintiff alleges that the defendants are engaged in interstate commerce or in the production of goods for interstate commerce?

3.    In what specific time periods the plaintiff alleges the defendants failed to pay overtime to the employees identified in Exhibits A-E of the complaint?.

4.    Does the plaintiff allege that the defendants failed to pay the employees identified in Exhibits A-E to the complaint minimum wages due to them?

5.    If yes, in what specific time periods the plaintiff alleges the defendants failed to pay minimum wages to the employees identified in Exhibits A-E of the complaint?.

17

**Hearing Requested**

The defendants request a hearing on the issues of fact and law presented by this

motion.

Respectfully submitted,

LE INC., ET AL

By their attorneys,


Paul L. Nevins
BBO No. 369930
47 Church Street
Wellesley, Massachusetts 02482
(781) 237-9018


Philip R. Olenick
BBO No. 378605
101 Tremont Street - Suite 801
Boston, Massachusetts 02108
(617) 357-5660

**Local Rule 7.1(b) Certification**

The undersigned hereby certifies that, on August 13, 2004, he conferred with plaintiff's
counsel, identified below in the **Certificate of Service,** and informed him of the pendency of
this motion.


_____
Paul L. Nevins

**Certificate of Service**

The undersigned hereby certifies that, on August 13, 2004, served a true copy of the foregoing upon all parties by causing it to be sent, via first class mail, postage prepaid, to:

John S. Casler, Esquire
Deputy Regional Solicitor
**U.S. Department of Labor**
**Office of The Solicitor**
JFK Federal Building, Room E-375
Boston, MA 02203


_____
Paul L. Nevins

Page 2                                          2
362 U.S. 310, *; 80 S. Ct. 739, **;
                    4 L. Ed. 2d 753, ***; 1960 U.S. LEXIS 1941

LEXSEE 362 U.S. 310

**MITCHELL, SECRETARY OF LABOR, v. H. B. ZACHRY CO.**

**No. 83**

**SUPREME COURT OF THE UNITED STATES**

*362 U.S. 310; 80 S. Ct. 739; 4 L. Ed. 2d 753; 1960 U.S. LEXIS 1941; 39 Lab.
Cas. (CCH) P66,361*

**February 25, 1960, Argued
April 4, 1960, Decided**

**RIOR HISTORY:**

   CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE FIFTH CIRCUIT.

**DISPOSITION:**

   262 F.2d 546, affirmed.

**LexisNexis(R) Headnotes**

***Labor & Employment Law > Wage & Hour Laws >
Coverage & Definitions***

[HN1] Section 7 of the Fair Labor Standards Act, the
hours provision, directs an employer to comply with its
provisions as to any of his employees who is engaged
in commerce or in the production of goods for
commerce.

***Labor & Employment Law > Wage & Hour Laws >
Coverage & Definitions***

[HN2] Whether construction work is covered by the
hours provision of the Fair Labor Standards Act
depends upon all the circumstances of the relation of
the particular activity to "commerce" in the statutory
sense and setting.

***Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions***

[HN3] Limits on coverage of the hours provision of the Fair Labor Standards Act cannot be understood merely in terms of the social purposes of the Act, in light of which any limitations must appear inconsistent. For the Act also manifests the competing concern of Congress to avoid undue displacement of state regulation of activities of a dominantly local character. Accommodation of these interests was sought by the device of confinement of coverage to employment in activities of traditionally national concern. The focus of coverage became "commerce," not in the broadest constitutional sense, but in the limited sense of § 3(b) of the Act: trade, commerce, transportation, transmission, or communication among the several States. Employment "in" such activities is least affected by local interests. A step removed from employment "in commerce" is employment "in" production which is "for" commerce.

***Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions***

[HN4] An activity is rightly called construction and that is therefore distinct from operation, does not per se remove it from coverage under the hours provision of the Fair Labor Standards Act. Construction may be sufficiently "closely related" to production to place it in that proximity to "commerce" which the Act demands as a predicate to coverage.

***Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions***

[HN5] An activity sufficiently "directly related" to commerce to be "in" it is, at most, no further removed from "commerce" than is the employment "in production" itself which the Fair Labor Standards Act expressly covers. For this reason, although the Act has never contained even a general definition of the relationship of an activity to commerce necessary to justify its inclusion, such a relationship has been extrapolated by the courts in conformity with the statutory scheme, so as to displace state regulation throughout the farthest reaches of the channels of interstate commerce. No independent vitality attaches to conclusory phrases such as "directly" or "vitally related." What is finally controlling in each case is the

relationship of the employment to "commerce," in the sense of the statute.

***Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions***

[HN6] Bearing in mind the cautionary revision of the Fair Labor Standards Act in 1949, and that the focal center of coverage is "commerce," the combination of the remoteness of the construction of a dam from production, and the absence of a dedication of the completed facilities either exclusively or primarily to production, persuaded the Supreme Court that the activity is not "closely related" or "directly essential" to production for commerce.

**SYLLABUS:**

Employees of a large construction contractor engaged in constructing a dam solely to increase the reservoir capacity of the local water system of a city and its vicinity, all within a single State, are not "engaged in commerce or in the production of goods for commerce" or in "any closely related process or occupation directly essential to the production thereof," within the meaning of § § 3 (j) and 7 (a) of the Fair Labor Standards Act, as amended in 1949, and, therefore, they are not covered by the overtime requirements of the Act, even though a substantial part of the water will be used by producers of goods for interstate commerce and an insignificant part by interstate instrumentalities. Pp. 310-321.

**COUNSEL:**

Bessie Margolin argued the cause for petitioner. With her on the brief were Solicitor General Rankin, Harold C. Nystrom, Sylvia S. Ellison and Jacob I. Karro.

R. Dean Moorhead and Chester H. Johnson argued the cause and filed a brief for respondent.

**JUDGES:**

Warren, Black, Frankfurter, Douglas, Clark, Harlan, Brennan, Whittaker, Stewart

**OPINIONBY:**

FRANKFURTER

**OPINION:**

   **[*310]    [***756]    [**740]**   MR. JUSTICE
FRANKFURTER delivered the opinion of the Court.

   Once again we are presented with a nice question
concerning the scope of the Fair Labor Standards Act,
as amended.  63 Stat. 912, *29 U. S. C. § 207.* The
respondent, a construction contractor, was engaged by
the Lower Nueces River Water Supply District
(hereafter to be called the District) to   **[**741]**
construct a dam and impounding facilities on the lower
Nueces River in Texas at a cost of about $ 6,000,000,
in order to increase roughly tenfold the District's then-
existing reservoir capacity.  The dam is not a multi-
purpose project; its sole purpose is to  **[*311]**  create
an expanded reservoir for the District.  The water
impounded by the District is supplied to consumers
locally, within the State of Texas.  The site of the new
dam was chosen 1,400 feet downstream from the old,
with the expectation that upon completion of the new
construction the old dam would be inundated and thus
replaced by the greatly expanded reservoir.  In the
interim until completion, the old facilities could serve
to assure a continuing water supply.

   The District, though for some purposes an
independent governmental agency under Texas law,
may here be dealt with simply as the water supply
system of the included City of Corpus Christi.  Its
contract with the City requires it to supply the City
with the entire water output; and the City in turn agrees
to operate and maintain the completed dam and
impounding facilities and to supply water to consumers
within the District, but outside city limits.   It is
conceded that between 40% and 50% of all water
consumption from the system is accounted for by
industrial (as distinguished from residential,
commercial, hospital, municipal and other) users, most
of whom produce goods for commerce, and that
**[***757]**  water is essential to their operations.  Nor is
it contested that an unspecified amount of the water
supplied by the District is consumed by facilities and
instrumentalities of commerce.

   It is agreed that as to the employees here involved
-- those actually engaged in construction work on the

dam -- the respondent failed to comply with the
requirements of  §  7 of the Act, if it is applicable. n1

   n1 With exceptions not relevant here, §  7,
   [HN1] the hours provision, directs an employer
   to comply with its provisions as to "any of his
   employees who is engaged in commerce or in
   the production of goods for commerce . . . ."

   On the basis of its applicability the Secretary of
Labor sought an injunction in the United States District
Court for the Southern District of Texas.  That court
granted  **[*312]**  the injunction, on two grounds of
coverage: (1) since water from the system is supplied
to facilities and instrumentalities of commerce, those
engaged in building the dam are engaged in the
production of goods -- water -- for commerce; and (2)
since the water supplied is essential to industries in
Corpus Christi producing goods for commerce,
construction of the dam is an occupation "closely
related" and "directly essential" to the production of
goods for commerce. While the District Court conceded
"that Congress intended to narrow the scope of
coverage" by the 1949 amendment of the statutory
definition of "produced" in §  3 (j), 63 Stat. 911, n2 it
concluded that this employment remained within the
coverage of the Act.

   n2 Only the last clause of §  3 (j) was
   amended in 1949.  Before the amendment it was
   provided that "an employee shall be deemed to
   have been engaged in the production of goods if
   such employee was employed in producing,
   manufacturing, mining, handling, transporting,
   or in any other manner working on such goods,
   *or in any process or occupation necessary to
   the production thereof*, in any State." 52 Stat.
   1061.   (Emphasis added.)  The amended last
   clause provides: "*or in any closely related
   process or occupation directly essential to the
   production thereof*, in any State." 63 Stat. 911.
   (Emphasis added.)

   On appeal the Court of Appeals for the Fifth
Circuit reversed.  *262 F.2d 546.* It disposed of the first

ground of the District Court's decision by holding that the building of a dam could not itself constitute the production of goods for commerce, whatever the use to which [**742] the impounded water might be put. In disposing of the second, it invoked a rule that "those engaged in building a plant to be used for the manufacturing of goods do not even come within . . . the . . . statutory definition . . . ." It concluded that under such a rule there could be no coverage of employees engaged in construction of a facility which was not to engage in, but merely to support, the manufacture of goods for commerce. It concluded [*313] further that the "remoteness" of these jobs from production justified their exclusion from coverage. Both conclusions reflected its general view that "the amendment of 1949 made even more restrictive the definition of production of goods" than it was under the Act of 1938, when it substituted the words "directly essential" for the word "necessary," and added the requirement that the employment be "closely related" to production.

We brought the case here, *361 U.S. 807,* because of an asserted conflict between circuits. (See *Chambers Construction Co.* v. *Mitchell, 233 F.2d 717,* and *Mitchell v. Chambers Construction Co., 214 F.2d 515.*)

[***HR1]    [***HR2]    The court below, in applying its [***758] rule excluding "construction," relied on our *per curiam* decision in *Murphey v. Reed, 335 U.S. 865,* and distinguished the more detailed decision in *Mitchell v. Vollmer & Co., 349 U.S. 427,* which expressly rejected the "new construction" rule and held construction of a new lock on the Gulf Intracoastal Waterway to be covered employment. It did so by holding that *Vollmer* concerned only coverage under the "in commerce" provision of the Act. The *Vollmer* decision cannot be so confined. It rejected an inflexible "new construction" rule, which had developed in cases under the *Federal Employers' Liability Act, see 349 U.S., at 429, 431-432,* as inconsistent with the more pragmatic test of coverage under the Fair Labor Standards Act. As early as *Kirschbaum Co.* v. *Walling, 316 U.S. 517,* we recognized that the penetrating and elusive duty which this Act casts upon the courts to define in particular cases the less-than-constitutional reach of its scope, cannot be adequately

discharged by talismanic or abstract tests, embodied in tags or formulas. No exclusion of construction work from coverage can be derived from the *per curiam* disposition of *Murphey v. Reed, supra.* There, as here, [HN2] whether construction work is covered depends upon all the circumstances of the relation of the particular activity [*314] to "commerce" in the statutory sense and setting, the question to which we now turn.

[***HR3]    [***HR4]    By confining the Act to employment "in commerce or in the production of goods for commerce," Congress has impliedly left to the States a domain for regulation. For want of a provision for an administrative determination, by an agency like the National Labor Relations Board, the primary responsibility has been vested in courts to apply, and so to give content to, the guiding yet undefined and imprecise phrases by which Congress has designated the boundaries of that domain.

Before 1949 the boundary of "production" coverage was indicated by the statutory requirement that to be included an activity not "in" production must be "necessary" to it. 52 Stat. 1061. The interaction and interdependence of the processes and functions of the industrial society within which these definitions must be applied, could easily lead courts to find few activities that were discernibly related to production not to be "necessary" to it, in a logical sense of that requirement. The statute, as illuminated by its history, see *Kirschbaum Co.* v. *Walling, supra, at 522,* demanded that such [**743] merely logical deduction be eschewed. Courts were to be on the alert "not to absorb by adjudication essentially local activities that Congress did not see fit to take over by legislation." *10 East 40th St. Co.* v. *Callus, 325 U.S. 578, 582-583.*

[***HR5]    In *Kirschbaum Co.* v. *Walling, supra,* we added what was deemed a compelled gloss to suggest the limitations of "necessary." We found that the jobs of building-maintenance employees, ranging in responsibility from electrician to porter, of a loft building locally owned but tenanted by production facilities of producers for commerce, had "such a close and immediate tie [***759] with the process of production for commerce, and [were] therefore so much an essential part of it," that the employees' occupations

[*315] were "necessary" to production. In *Borden Co.* v. *Borella, 325 U.S. 679,* precisely the same formulation expressed our conclusion that maintenance employees of a producer-owned office building which was tenanted in part by the producer's central offices, but not by any production facilities, were also within the Act's coverage. In *10 East 40th St. Co.* v. *Callus, 325 U.S. 578,* however, maintenance employees of an office building were held not to be covered. Although the building contained offices of some producers, it was locally owned, held out for general tenancy, and in fact tenanted by a miscellany of tenants. Regardful of the governing principle that coverage turns upon the nature of the employees' duties, and not upon the nature, local or interstate, of the employer's general business, we held the case distinguishable from *Borden* and *Kirschbaum* because the employment, since part of an enterprise which "spontaneously satisfies the common understanding of what is local business," was itself sufficiently different, despite identical employee duties, from prior cases to justify regarding it as separate from the "necessary parts of a commercial process" which are within the Act. These decisions and distinctions were not exercises in lexicography. No niceties in phrasing or formula of words could do service for judgment, could dispense with painstaking appraisal of all the variant elements in the different situations presented by successive cases in light of the purpose of Congress to limit coverage short of the exercise by it of its full power under the Commerce Clause.

[***HR6]    [***HR7] While attempted formulas of the relationship to production required for coverage cannot furnish automatic or spontaneous answers to specific problems of application as they arise in their protean diversity, general principles of the Act's scope afford direction of inquiry by defining the broad bounds within which decision must move. In *Kirschbaum Co.* v. *Walling, supra,* we found [*316] that [HN3] limits on coverage cannot be understood merely in terms of the social purposes of the Act, in light of which any limitations must appear inconsistent. For the Act also manifests the competing concern of Congress to avoid undue displacement of state regulation of activities of a dominantly local character. Accommodation of these interests was sought by the device of confinement of coverage to employment in

activities of traditionally national concern. The focus of coverage became "commerce," not in the broadest constitutional sense, but in the limited sense of § 3 (b) of the statute: "trade, commerce, transportation, transmission, or communication among the several States . . . ." Employment "in" such activities is least affected by local interests. A step removed from employment "in commerce" is employment "in" production which is "for" commerce. Under this clause we have sustained coverage whether the product is to be consumed primarily by commerce in the statutory sense, by its "facilities and instrumentalities," see *Alstate Construction Co.* v. *Durkin, 345 U.S. 13,* or, as in the case of the products [**744] of the [***760] industrial consumers of water here, to move in it. Furthest removed from "commerce" is employment not "in" production "for" commerce but in an activity which is only "related" to such production. In applying this provision, we have necessarily borne in mind that it is furthest removed in the scheme of the statute from the hub of the national interest in "commerce" upon which a limited displacement of state power is predicated.

[***HR8]    [***HR9] The amendment of § 3 (j) in 1949 did not alter the basic statutory scheme of coverage, but did reinforce the requirement that in applying the last clause of the section its position at the periphery of coverage be taken into account as a relevant factor in the determination. In revising coverage Congress turned only to the last clause of the section, which it evidently continued to regard as [*317] marking the outer limits of applicability. The amendment substantially adopts the gloss of *Kirschbaum* to indicate the scope of coverage of activities only "related" to production. But examination of its history discloses that in adopting that gloss the purpose of Congress was not simply to approve everything done here and in the lower courts in what purported to be specific applications of that inevitably elusive formulation. While the approach of *Kirschbaum* was confirmed, the change manifests the view of Congress that on occasion courts, including this Court, had found activities to be covered, which the law-defining body deemed too remote from commerce or too incidental to it.

362 U.S. 310, *; 80 S. Ct. 739, **;
4 L. Ed. 2d 753, ***; 1960 U.S. LEXIS 1941

The House, overriding the contrary action of its Labor Committee which had left § 3 (j) unchanged, see H. R. 5856, as reported, and H. R. Rep. No. 267, 81st Cong., 1st Sess., 1949, adopted an amendment proposed by Committee member Lucas from the floor (95 Cong. Rec. 11000), which did amend § 3 (j). Representative Lucas made it plain that it was his purpose to constrict coverage. 95 Cong. Rec. 11001. As passed by the House, § 3 (j) was identical with the present Act except that for "directly essential" the House version used "indispensable."

The Senate substituted its own bill, S. 653, for the House draft, and its version left § 3 (j) unchanged. The resulting conference adopted the House bill insofar as it amended § 3 (j), with only the change already noted.

While the reports presented to the House and Senate by their respective conferees manifest some disagreement as to degree, n3 it is apparent that some restraint on coverage was intended by both. In the House, for example, *Kirschbaum* was approved and our decision in *Martino* v. *Michigan Window Cleaning Co., 327 U.S. 173,* was disapproved **[*318]** (H. R. Conf. Rep. No. 1453, 81st Cong., 1st Sess., p. 15); while the Senate conferees, with different emphasis, noted only that the standard applied in "most" of our decisions was adopted. 95 Cong. Rec. 14874.

n3 The views of a minority of the Senate conferees emphasize the apparent inconsistencies between the reports delivered to the House and Senate. 95 Cong. Rec. 14880.

Both reports use as illustrations of coverage which remains unchanged by the amendment, employment in utilities supplying water to the producers of goods for commerce. H. R. Conf. Rep. No. 1453, p. 14; 95 Cong. Rec. 14875. But no illustration in either statement deals with construction of a dam designed solely for use as an impounding facility for a local water distribution **[***761]** system. The House Report does expressly state that the case of *Schroeder Co.* v. *Clifton, 153 F.2d 385* (C. A. 10th Cir.), is an instance of an activity not within the amended Act. But the activity there involved was one in support of

construction of a dam; it was not the construction of the dam itself. Thus, even were we to accept the illustrations in the House Report **[**745]** as authoritative, we would not be relieved of the duty of deciding where between these boundaries of approval and disapproval the present facts lie. To do so requires that we once again apply the formulation set down in *Kirschbaum*, which, in light of the 1949 amendment, we must do with renewed awareness of the purpose of Congress to avoid intrusion into withdrawn local activities.

To establish coverage the Secretary relies upon *Farmers Reservoir & Irrigation Co.* v. *McComb, 337 U.S. 755,* which, he asserts, establishes that employees are covered who are engaged not merely in operation of, but in maintenance and repair of, the facilities of a company distributing water for consumption by producers for commerce. n4 He urges that once it is recognized -- as the court **[*319]** below failed to do -- that construction work is not excluded from the Act's coverage, this concededly essential expansion of facilities is not distinguishable from maintenance and repair in any characteristic made relevant by the standard of "closely related" and "directly essential" to production. We do not agree.

n4 The Secretary similarly relies on the approval in general terms of such coverage in the reports of the House and Senate conferees. H. R. Conf. Rep. No. 1453, 81st Cong., 1st Sess., p. 14; 95 Cong. Rec. 14875.

**[***HR10]** Assuming *arguendo* that maintenance and repair of the completed dam would be covered employment, it does not follow that construction of the dam therefore is. The activities are undoubtedly equally "directly essential" to the producers of goods who depend upon the water supply; but they are not equally remote from production or from the "commerce" for which production is intended. The distinction between maintenance and repair on the one hand, and replacement or new construction on the other, may often be difficult to delineate but is a practical distinction to which law must not be indifferent. Its relevance here, where our purpose must

be to isolate primarily local activities from the flow of commerce to which they invariably relate, lies in the close relation of maintenance and repair to operation, as opposed to replacement or new construction which is a separate undertaking necessarily prior to operation and therefore more remote from the end result of the process. As we held in *Vollmer,* that [HN4] an activity is rightly called construction and is therefore distinct from operation, does not *per se* remove it from coverage. Construction may be sufficiently "closely related" to production to place it in that proximity to "commerce" which the Act demands as a predicate to coverage. Here, however, neither a facility of "commerce" nor a facility of "production" is under construction. Operation of the completed dam will merely support production facilities; and construction of the dam is yet another step more remote.

[***HR11]    [***HR12]   The Secretary relies upon *Mitchell v. Lublin, McGaughy & Associates, 358 U.S. 207,* and *Mitchell v.* [*320] *Vollmer & Co., supra,* to establish that this [***762] construction is closely enough related to "production of goods for commerce" to be within the coverage of the Act. In each of those cases a construction activity was found "directly and vitally related" to "commerce" and therefore "in commerce," and what we have already said demonstrates that they are not useful guides here. As *Lublin, supra,* manifests, [HN5] an activity sufficiently "directly related" to commerce to be "in" it is, at most, no further removed from "commerce" than is the employment "in production" itself which the Act expressly covers. Compare *Mitchell v. Lublin, McGaughy & Associates, supra,* with *Alstate Construction Co.* v. *Durkin, 345 U.S. 13.* For this reason, although the Act has never contained even a general [**746] definition of the relationship of an activity to commerce necessary to justify its inclusion, such a relationship has been extrapolated by the courts in conformity with the statutory scheme, so as to displace state regulation "throughout the farthest reaches of the channels of interstate commerce." *Walling v. Jacksonville Paper Co., 317 U.S. 564, 567.* No independent vitality attaches to conclusory phrases such as "directly" or "vitally related." What is finally controlling in each case is the relationship of the employment to "commerce," in the sense of the statute, and it needs no argument that as to that relationship

this case is significantly different from *Lublin* or *Vollmer.*

Moreover, though construction and operation of this dam are equally "directly essential" to the producers who require the water impounded and distributed, neither the construction nor the operation of the dam is designed for their use. Water is supplied by the District to a miscellany of users throughout its geographical area, and somewhat less than half of the consumption is by producers. These facilities, and their construction, are thus to be differentiated from the irrigation system in the [*321] *Farmers Reservoir* case, which was dedicated exclusively to supply water to farmers producing for commerce.

[***HR13]   These are no doubt matters of the nicest degree. They are inevitably so in the scheme and mode of enforcement of this statute. [HN6] Bearing in mind the cautionary revision in 1949, and that the focal center of coverage is "commerce," the combination of the remoteness of this construction from production, and the absence of a dedication of the completed facilities either exclusively or primarily to production, persuades us that the activity is not "closely related" or "directly essential" to production for commerce."

[***HR14]   The Secretary alternatively urges that because some of the water supplied by the District is consumed by facilities and instrumentalities of commerce, the water should be regarded as "goods" produced "for commerce" and the construction of the dam should be found sufficiently related to such production to be within the Act's coverage. He relies on *Alstate Construction Co.* v. *Durkin, supra,* and compares the water here to the construction materials there produced primarily for use in road construction. It is a sufficient answer to this contention that the record is devoid of evidence of a purposeful and substantial dedication of otherwise local production to consumption by "commerce" which was the basis of our decision in *Alstate.* [***763] Indeed, it appears that the water supplied to the facilities and instrumentalities of commerce is but an insignificant portion of the total.

*Affirmed.*

Page 9                                        9
362 U.S. 310, *; 80 S. Ct. 739, **;
                4 L. Ed. 2d 753, ***; 1960 U.S. LEXIS 1941

**DISSENTBY:**

    DOUGLAS

**DISSENT:**

    MR. JUSTICE DOUGLAS, with whom THE
CHIEF JUSTICE, MR. JUSTICE BLACK and MR.
JUSTICE BRENNAN concur, dissenting.

    The opinion of the Court is more consistent with
the dissent in *Mitchell v. Vollmer & Co., 349 U.S. 427,*
in which my Brother FRANKFURTER joined, than it
is with  **[*322]**  the Court's opinion in that case. The
liberal construction given the Act from *Kirschbaum Co.*
v. *Walling, 316 U.S. 517,* to *Alstate Construction Co.*
v. *Durkin, 345 U.S. 13,* and down to and including the
*Vollmer* case is now forsaken.  Yet this seems to me to
be a singularly inappropriate occasion to change the
direction of the law in a *mere matter of statutory
construction.*

    The report of the Senate Conferees (95 Cong. Rec.
14874-14875) which  **[**747]**  ushered §  3 (j) into the
law in its present form n1 said:

    "The work of employees of employers who
produce or supply goods or facilities for customers
engaged within the same State in the production of
other goods for interstate commerce may also be
covered as closely related and directly essential to such
production.  This would be true, for example, of
employees engaged in the following activities:

        . . . .

    "2. Producing and supplying fuel, power, water, or
other goods for customers using such goods in the
production of different goods for interstate commerce.
*Reynolds v. Salt River Valley Water Users Asso.* (143
F. (2d) 863 (C. A. 9)); *Phillips v. Meeker Coop. Light
and Power Asso.* (158 F. (2d) 698 (C. A. 8)); *Lewis v.
Florida Light and Power Co.* (154 F. (2d) 751 (C. A.
5)); *West Kentucky Coal Co.* v. *Walling* (153 F. (2d)
152 (C. A. 6))."

        n1 Section 3 (j) provides:

            "'Produced' means produced, manufactured,
        mined, handled, or in any other manner worked

on in any State; and for the purposes of this Act
an employee shall be deemed to have been
engaged in the production of goods if such
employee was employed in producing,
manufacturing, mining, handling, transporting,
or in any other manner working on such goods,
or in any closely related process or occupation
directly essential to the production thereof, in
any State."

    **[*323]**  The dam here under construction was to
furnish the City of Corpus Christi with a water supply -
- a city water system that services railroads, truck
companies, airlines, other instrumentalities of interstate
commerce and various producers of goods for
commerce. It is conceded that the major industries in
this area produce goods for commerce and use a
substantial amount of water in that connection.  Indeed,
40% to 50% of all water furnished by the city is used
industrially.

    *Reynolds v. Salt River Valley Water Users Assn.,
143 F.2d 863* (C. A. 9th Cir.), held that repair and
maintenance employees of canals and dams of an
irrigation company supplying water for growers of
crops intended for shipment in interstate commerce
were engaged in an occupation necessary for the
production of goods for commerce.

    *West Kentucky Coal Co.* v. *Walling, 153 F.2d 582*
(C. A. 6th Cir.), held that men producing coal sold to
factories producing goods for commerce were covered
by the Act.

    **[***764]**  *Meeker Cooperative Light & Power
Assn.* v. *Phillips, 158 F.2d 698* (C. A. 8th Cir.), held
that employees of a power cooperative distributing
electricity to companies that produced goods for
commerce were covered by the Act.

    These three decisions, as noted, were approved by
the Senate report defining the scope of §  3 (j).
Certainly then, employees maintaining this new dam
would be covered by the Act, as our own decision in
*Farmers Irrigation Co.* v. *McComb, 337 U.S. 755,*
indicates.

    How then, if these precedents are to be followed,
can employees who built the dam be out of reach of
the Act?

10

We held in *Mitchell v. Vollmer & Co., supra,* that construction of a lock to be used in commerce was work [*324] "in commerce." "The test is whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated, local activity." P. 429. There is no more remoteness here than there. It is difficult to understand why a stringent test of remoteness is used in determining whether construction work is related to "production of goods for commerce" when a liberal test was applied in the *Vollmer* case [**748] in holding that such work was "in commerce." See *Armour & Co.* v. *Wantock, 323 U.S. 126, 131.*

Prior to the 1949 amendments the standard in § 3 (j) was whether the work was in any "process or occupation necessary" for the production of goods for commerce. The present standard, so far as material here, is whether the work is "in any closely related process or occupation directly essential to the production" of goods for commerce. n2 The Senate report said that employees "repairing, maintaining, improving or enlarging . . . facilities of producers of goods" were covered. 95 Cong. Rec. 14875. This group, the report stated, were included because they were "performing tasks necessary to effective productive operations of the producer." 95 Cong. Rec. 14874.

n2 See note 1, *supra.*

Most of the decisions cited in the report which are descriptive of this category of employees were cases where the employees were working on existing structures or appliances used by producers of goods for commerce, n3 whether or not those facilities were owned by the producers. Such is the case of *Borden Co.* v. *Borella, 325 U.S. 679.* But one of the cases cited by the report as [*325] also descriptive of this group of employees was *Walling v. McCrady Construction Co., 156 F.2d 932* (C. A. 3d Cir.), which brought within the Act's coverage workers building roads and bridges to be used to transport goods in process of production for interstate commerce. These facilities, like the one in the present case, were not owned by the producers, nor were some of them yet in existence. But when completed they would serve as facilities for those who were producing goods for commerce. That case clearly suggests that the Congress in redefining the scope of § 3 (j) was following the broad contours of the coverage which had been delineated by the *construction* cases, as well as by the *maintenance* cases.

n3 And see *Roland Electrical Co.* v. *Walling, 326 U.S. 657,* also cited with approval in the report. 95 Cong. Rec. 14875.

It seems as if there could be no doubt that the present case is [***765] brought squarely within that category, for this project was not the construction of a wholly new water system but an improvement of an existing water system. Moreover, the water system being improved would seem to be as much a facility of those producing goods for commerce as was the highway in the *McCrady* case. Moreover, in *Alstate Construction Co.* v. *Durkin, supra,* a company, making products sold intrastate but used to improve the facilities of those producing goods for commerce, was held to be employing workers covered by the Act. The work in improving the present facility used by producers of goods for commerce is at least as close to the process of production as the labor of the men in the *Alstate* case.

So it is that I believe today's decision changes the symmetry of the judicial rulings under the Act, narrows its scope, and impairs its effectiveness. Today's ruling is a departure from the accepted construction. By this retreat I fear we invite hostile constructions that will undermine the broad base which Congress gave the Act. If there is to be a change in the direction of the law or an [*326] alteration in its emphasis, it should be done by Congress which is far better suited than we to mark the farthest areas which the liberal policies of the Act were designed to cover. I regret that today we give up territory that Congress has fairly claimed, that we take a backward step from the measures Congress designed to protect the lowest paid and weakest group of wage earners in the Nation.

Page 11                                          11
362 U.S. 310, *; 80 S. Ct. 739, **;
                         4 L. Ed. 2d 753, ***; 1960 U.S. LEXIS 1941

**REFERENCES:**  Return To Full Text Opinion

Annotation References:

1. Judicial questions regarding Federal Fair Labor Standards Act and state acts in conformity therewith, *130 ALR 272, 132 ALR 1443*.

2. What employees are engaged in interstate commerce within Fair Labor Standards Act, 87 L ed 87.

3. Criteria applicable in determining whether employees are engaged in commerce, or in the production of goods for commerce, within wages and hours coverage of Fair Labor Standards Act, 99 L ed 1202 (limited to Supreme Court cases).

4. Building construction and activities incident thereto as interstate commerce within contemplation of Fair Labor Standards Act, *8 ALR2d 738*.

5. Employment in connection with highway construction or repairs as within Fair Labor Standards Act, *43 ALR2d 891* .